936 F.2d 572
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
AMPLICON, INC., Plaintiff-Appellee,
v.
Clyde FULLER and Southwest Motor Freight, Inc., Defendants-Appellants.
 No. 90-5525.
 United States Court of Appeals, Sixth Circuit.
 June 21, 1991.
 
 Before KENNEDY and NATHANIEL R. JONES, Circuit Judges, and CHURCHILL, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Amplicon, Inc. ("Amplicon") brought this action seeking damages from Southwest Motor Freight, Inc. ("Southwest") for the use of its trucks based on a theory of quantum meruit. Southwest purchased the assets of Southwest Equipment Rental, Inc. ("SERI") to whom Amplicon had leased the trucks. Southwest had the use of nine trucks after February 12, 1988, the date the lease was rejected pursuant to a bankruptcy court order, until March 30, 1988 when the trucks were returned to Amplicon.
 
 
 2
 The suit was brought in the Tennessee Chancery Court and the case was removed to the District Court based on diversity of citizenship and an estimated amount in controversy of $127,292. The parties agreed to have the case tried before a magistrate. The magistrate entered judgment in favor of Amplicon and determined damages at $25,903.22. Southwest appealed from this judgment. On May 18, 1990, this Court remanded the case for correction of a clerical error in the magistrate's judgment and order, but otherwise retained jurisdiction. The magistrate corrected this clerical mistake and increased the damage award to $28,942.66. The case is now before this Court on appeal from the judgment entered below, as clarified by the magistrate's subsequent order.
 
 
 3
 Prior to January 8, 1988, Amplicon leased twenty trucks to SERI. SERI defaulted on the lease agreement for these trucks, and Amplicon, through a replevin action, repossessed five of the twenty tractor truck units. SERI filed a Chapter 11 bankruptcy on January 8, 1988; this was converted to a Chapter 7 bankruptcy on March 8, 1988. Amplicon made several motions during the bankruptcy proceedings in an effort to protect its interest in the leased vehicles which included a motion on January 20, 1988, to require the trustee to assume or reject its lease.
 
 
 4
 In an effort to solve SERI's financial woes, the trustee negotiated the sale of some of Southwest's assets to a third party, Clyde Fuller ("Fuller"). On January 28, 1988, the bankruptcy court held a hearing on the proposed sale of assets to Fuller. Amplicon was present at this hearing, and the parties decided that the Amplicon lease would not be rejected at this time. The record indicates, however, that rejection seemed imminent to both parties. Accordingly, an attempt was made to agree upon the manner in which the trucks would be turned over. They were scattered across the United States. The parties failed to arrive at a turn-over procedure at this hearing, and the court declined to mandate one. Fuller subsequently purchased the assets of SERI and began operating the business under the name of Southwest Motor Freight, Inc.
 
 
 5
 Amplicon and Southwest subsequently agreed upon the manner in which the trucks would be returned to Amplicon. Amplicon's counsel wrote to Fuller on January 29, 1988, stating that "it is our understanding that you will not use the Amplicon equipment and that it will remain parked where located." Joint App. vol. I, at 65. Southwest represented to Amplicon on several subsequent occasions that the trucks were being held for repossession by Amplicon in accordance with the understanding embodied in the January 29th letter. In actuality, though, Southwest continued to use nine of the fifteen trucks after receipt of the January 29th letter.
 
 
 6
 On February 12, 1988, the bankruptcy court issued an order allowing the trustee to reject the Amplicon lease. After exchanging several rounds of letters, Amplicon eventually obtained possession of all of its tractor truck units. The last truck was retrieved on June 9, 1988. The instant dispute focuses on the issues of damages arising from the use of nine of Amplicon's trucks by Southwest after the issuance of the February 12, 1988 order.
 
 
 7
 Amplicon filed a suit for damages based upon the theory of quantum meruit. Specifically, Amplicon asked for damages based on a mileage fee and a daily availability fee running from February 12th until the time of recovery for each truck actually used by Southwest. The magistrate found Southwest liable and concluded that nine of the fifteen trucks in Southwest's possession were actually used by defendant from February 12th until March 30, 1988.
 
 
 8
 The magistrate separated the trucks actually used into two groups and calculated their damages using two different methods. For seven of the trucks, the court found that Southwest benefited from the availability of these trucks from February 12th until March 30, 1988. Based on this finding, the magistrate charged Southwest a weekly rental fee of $450 and $0.18 cents per mile. For the remaining two trucks, the magistrate concluded that an availability fee was inappropriate. Rather, damages were calculated by estimating that a truck driver travels an average of 1,000 miles per day. The court then divided the actual miles these trucks were driven during the relevant period by 1,000, arriving at the number of rental days chargeable to Southwest.
 
 
 9
 Both parties contest the manner in which the District Court calculated damages for the availability of Amplicon's trucks to Southwest after the February 12th order. Southwest argues that the magistrate erred by charging it a daily rental fee for the availability of seven trucks from February 12, 1988 to March 30, 1988, in the absence of a showing that the trucks were never actually used on a particular day. According to Southwest, the magistrate should have assessed an availability fee only for the days Southwest actually used a truck or should have applied the "1000 mile per day" formula. On the other hand, Amplicon alleges that the magistrate erred by charging a daily rental fee for two trucks based upon their actual mileage. According to Amplicon, the court should have treated these trucks in a manner similar to its treatment of the other seven trucks used by Southwest: assess an availability fee for the period the trucks were in Southwest's possession regardless of the actual usage.
 
 
 10
 Both parties argue for the application of a single formula to calculate damages based on the availability of the nine trucks used by Southwest. The magistrate distinguished between two types of usage for these trucks, short-distance and long-distance hauls. For seven trucks, the magistrate applied a formula which charged a weekly rental fee for availability. This fee arose because of the significant number of actual miles put on these trucks without any long-distance moves to account for such mileage.[1] The obvious implication is that Southwest was using these trucks for numerous short-distance moves in the local region. For the other set of trucks, the magistrate concluded that the evidence indicated that these trucks were involved in long-distance moves. Both trucks comprising this set were located in Washington and Maryland, respectively, as of February 12th, but were turned in at terminals located in Tennessee and California. Joint App. vol. II, at 198 (exhibit 15).
 
 
 11
 It was not unreasonable for the magistrate to distinguish between the two sets of trucks based on the nature of their usage. Significant mileage placed on trucks from short-distance hauls raises the inference that such trucks were used on numerous days because of the nature of short-distance moves. On the other hand, long-distance hauls typically involve less frequent stops and greater mileage. Greater mileage is logged in fewer days as compared to trucks involved in short-distance hauls. Nor was there any indication that these trucks were used for short-distance hauls upon completion of their long-distance hauls. Hence, the magistrate did not err when he applied different formulas based on the purpose for which the trucks were used.
 
 
 12
 Further, any uncertainty as to the actual availability of the trucks was created by the actions of Southwest. Southwest failed to produce documentary evidence which it alone possessed that would have permitted a more refined calculation of damages. Southwest's president, Clyde Fuller, admitted that it had records in its computer showing the actual trips taken by the nine trucks. Southwest maintained, however, that retrieval of this information from its computer would be too burdensome. Although given numerous opportunities, Southwest declined to produce these documents. In light of these actions by Southwest, all that is necessary is that there be a factual basis from which damages can be reasonably inferred. Williston on Contracts, 3d. ed. Sec. 1346, at 243 (1968). The magistrate's determination comports with this standard.
 
 
 13
 Finally, the magistrate imposed damages based on availability for those trucks actually used by Southwest from February 12 until March 30, 1988. No availability fees were assessed against Southwest for trucks in its possession but not actually used. In this manner, the magistrate limited damages based on availability to the extent practicable based on the evidence presented. Based on a review of the record in light of the relevant principles of quantum meruit, we conclude that the magistrate did not err in his calculation of damages.
 
 
 14
 Southwest next alleges that Amplicon failed to prove its damages. Southwest first argues that the magistrate erred by admitting a document showing the location of Amplicon's vehicles as of February 12th. We find this argument unavailing. Even if the magistrate erred in admitting this document to prove the location of the trucks, Amplicon introduced without objection other evidence to prove this same fact. See, e.g., Joint App. vol. II, at 198 (schedule prepared by Southwest stating location of vehicles as of February 12, 1988, and admitted into evidence without objection). Thus, any error that may have occurred regarding the admission of the contested document is harmless.
 
 
 15
 Southwest further contends that Mr. Mowery and Mr. Robinson, the expert witnesses used by Amplicon to prove the reasonableness of rental charges, lacked the requisite qualifications to testify and thus were incompetent. A trial judge has broad discretion in determining the qualification of experts. Benson v. Fowler, 43 Tenn.App. 147, 306 S.W.2d 49 (Tenn.App.1957). The record demonstrates that Mr. Mowery and Mr. Robinson had adequate qualifications to testify on the issue of rental charges. Further, the record does not suggest that Southwest was prevented from admitting evidence--including testimony from its own expert witnesses--to contradict or supplement the testimony of Mr. Mowery or Mr. Robinson. Nor was Southwest prevented from cross-examining either of these witnesses so as to demonstrate to the finder of fact the limitations of their knowledge and experience. Hence, the magistrate did not err when he admitted the testimony of these witnesses.
 
 
 16
 Southwest also contests the date from which damages should be measured. The order was issued on February 12, 1988, but stated that any objections must be raised within ten days or the lease would be deemed rejected. Southwest asserts that the order did not become effective until February 22, 1988. Thus, damages should be measured from February 22nd and not February 12th.
 
 
 17
 The court properly concluded that the lease was rejected on February 12, 1988, the date of the order. The order states that "the lease ... is hereby rejected." Joint App. vol. II, at 195. Further, the order provided that the parties were to accomplish an orderly and cooperative return of the vehicles to Amplicon. Previously, the parties agreed that Amplicon could recover its trucks upon entry of the order. Amplicon stated in its January 29, 1988, letter that "we will go to the appropriate locations to obtain possession of the equipment upon entry of an order approving the rejection of the Amplicon lease...." Joint App. vol. II, at 193. Thus, Amplicon had possessory rights to its trucks as of February 12, 1988, by virtue of both the bankruptcy court's order and Southwest's consent.
 
 
 18
 Southwest argues for the first time on appeal that Amplicon should be denied recovery because it acted inequitably. Southwest failed to raise this issue before the magistrate. It is a well-established rule that an appellate court will not address claims unless properly presented below. Singleton v. Wulff, 428 U.S. 106 (1976); Sigmon Fuel Co. v. Tennessee Valley Auth., 754 F.2d 162 (6th Cir.1985). We therefore decline to address this issue.
 
 
 19
 Finally, Southwest argues that the doctrine of res judicata bars Amplicon from seeking damages for use of one of its trucks located in Ohio. Prior to the instant case, Amplicon brought a suit in an Ohio court for replevin of one of its trucks from Southwest. Amplicon obtained possession of this truck through this replevin action on June 9, 1988. According to Southwest, Amplicon had to seek damages for denial of use and fair rental of the truck in the replevin action or be barred from raising this issue in subsequent suits.
 
 
 20
 If an individual is precluded from litigating a suit in a state court by the traditional principles of res judicata or collateral estoppel, he is similarly precluded from litigating the suit in federal court. Kremer v. Chemical Constr. Corp., 456 U.S. 461 (1982). Under Tennessee law, res judicata prevents the litigation of issues raised subsequent to a suit in which they might have been determined. American Nat'l Bank & Trust Co. v. Clark, 586 S.W.2d 825 (Tenn.1979). Thus, "as between the same parties in the same capacities and touching the same subject matter, estoppel of former judgment is conclusive, not only as to matters actually put in issue, but equally as to those which by due diligence of the litigant ... might have been put in issue." National Cordova Corp. v. Memphis, 214 Tenn. 371, 382, 380 S.W.2d 793 (Tenn.1964) (citing Graybar Elec. Co. v. New Amsterdam Casualty Co., 186 Tenn. 446, 211 S.W.2d 903 (Tenn.1948)).
 
 
 21
 Under Ohio law, an action for replevin "is a remedy ... by which the owner or one who has a general or specific interest in specific and identifiable personal property and the right to its immediate possession seeks to recover the possession of such property...." 18 Ohio Jurisprudence 3d Sec. 66, at 536-37 (1980) (Conversion and Replevin). Damages may be recovered in such an action. Jedlicka v. Good Mechanical Auto Co., 21 Ohio App.3d 19, 486 N.E.2d 121 (Ohio App.1984). Hence, a party may appropriately seek damages stemming from the improper retention of property, which would reasonably encompass any benefit accruing to the defendant or detriment to the plaintiff.
 
 
 22
 Damages based on a theory of quantum meruit overlap significantly with the damages sought under a replevin action. Amplicon should have sought in the replevin action all damages--including some form of rental charge--suffered by it stemming from Southwest's improper retention of its truck. We therefore conclude that principles of res judicata bar Amplicon from seeking damages in the instant suit based on a rental or availability fee for the truck which was the subject matter of the previous replevin action in Ohio.
 
 
 23
 For the foregoing reasons, we AFFIRM the decision of the magistrate as to eight of the nine trucks at issue. As to the truck subject to suit in Ohio, we REVERSE the decision of the magistrate. The action is remanded to the District Court with instructions to modify the judgment in accordance with this opinion.
 
 
 
 *
 The Honorable James P. Churchill, Senior United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 For example, six of the seven trucks which were assessed an availability fee were located in Chattanooga on the date that the lease was rejected and allegedly remained there until March 30th, the turn-in date. Notwithstanding Southwest's representations as to the nonuse of these trucks, the odometer readings indicated that these trucks travelled 11,486, 2,952, 2,408, 9,006, 8,347, and 2,735 miles, respectively. Joint App. vol. II, at 198 (exhibit 15)